**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| HERMAN GRANT JR., Plaintiff, | § § § | |
| vs. | § | Civil Action No.: 3:24-3021-MGL-PJG |
| DEPUTY ANGEL RODRIGUEZ, DEPUTY RICHARD SHOLTS, and JOHN DOE DEPUTIES, Defendants. | § § § § § | |

**ORDER ADOPTING THE REPORT AND RECOMMENDATION IN PART AND DECLINING TO ADOPT IT IN PART, GRANTING CERTAIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IT IN PART, AND DISMISSING THE REMAINING DEFENDANTS**

## I. INTRODUCTION

Plaintiff Herman Grant Jr. brought this suit against Defendants Deputy Angel Rodriguez and Deputy Richard Sholts (collectively, Defendants), as well as unknown John Doe deputies. He alleges multiple violations of the Fourth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1331.

This matter is before the Court for review of the Report and Recommendation (the Report) of the United States Magistrate Judge suggesting to the Court Rodriguez and Sholts's motion for summary judgment be granted and the John Doe deputies be dismissed without prejudice. The Report was made in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.

## II. FACTUAL AND PROCEDURAL HISTORY

This case concerns the events surrounding Grant's arrest following an altercation with his neighbor, James Witt, around 11 a.m. on May 15, 2021. Witt called to report the incident, and the Richland County Sheriff's Office responded to the scene. Defendants Rodriquez and Sholts, as well as their direct supervisor, Corporal J.C. Hawkes, arrived shortly after Grant left Witt's property.

The record before the Court contains footage from body-worn cameras (bodycams) Rodriguez, Sholts, and Hawkes's wore during these events. The following description of events comes from the Court's review of those recordings and other evidence in the record, and it is taken in the light most favorable to Grant.

Witt reported Grant had pointed a semiautomatic handgun at him during the argument, and when officers arrived he identified Grant, who by then was down the street standing by his car in the driveway of his own home. Hawkes saw him reaching into his car. Mot. Ex. 1 at 45:45 (Rodriguez Video #1). Then, with Grant standing by his open front door as Hawkes walked down the street, Hawkes told him to "come here" and motioned for him to approach. Pl. Response in Opp., Ex. 1 at 2:00 (Hawkes Video #2). Grant readily complied. *Id.* Rodriguez immediately placed him in handcuffs, and Grant left his keys on the back of his convertible. *Id.* at 2:30. Rodriguez then frisked Grant, recited to him his *Miranda* rights, and stated he was "not under arrest." Rodriguz Video #1 at 1:45.

Hawkes proceeded to look through the convertible, moved the seats and searched under them, picked up objects, and manipulated loose and torn fabric. Hawkes Video #2 at 3:00. Hawkes then approached the front door of the house, which Grant had left open, and looked inside. Hawkes

Video #1 at 5:00. He stepped over the threshold of the home and looked around with a flashlight for approximately thirty to forty-five seconds before heading back out. *Id.* at 5:10.

While Hawkes looked around the car and home, Rodriguez spoke with Grant who was attempting to explain his side of the story. Grant admitted to arguing with Witt and to owning a rifle he kept inside the house. Rodriguez Video #1 at 2:00, 5:45. He also repeatedly denied having any gun other than the rifle. *Id.* at 5:30, 8:30, 9:40. Grant offered to show the officers inside to see the rifle. *Id.* at 10:30

In the conversation, Rodriguez told Grant several times in clear terms, "You either give me consent to search the house, search the car, or I get a search warrant to search the car and search the house . . . . Those are the only two choices, I'm not discussing it anymore . . . ." Hawkes Video #2 at 10:30.

When Hawkes returned from looking inside the home, he began looking through Grant's phone with his clear and unchallenged consent. Several minutes later, Hawkes reached for Grant's car keys, which were still on the trunk of the car. Rodriguez Video #1 at 12:15; Hawkes Video #2 at 10:30. Hawkes picked the keys up and leaned into the car to unlock the center console. Rodriguez Video #1 at 12:20. Grant protested, "Oh, you need a warrant." *Id.* at 12:25. Hawkes disagreed, opened the console anyway, and found a revolver inside. *Id.* at 12:30. Grant claimed the revolver belonged to someone else. *Id.* at 12:40.

Thereafter, Rodriguez immediately escorted Grant to his police car and placed him in the backseat. *Id.* at 13:00. He ran Grant's information and discovered he had an outstanding warrant for assault and battery. *Id.* at 15:30. He also learned Grant is prohibited from owning a firearm. *Id.* at 19:45. Rodriguez and Grant sat in the car for approximately thirty to forty minutes.

It was hot outside that day, and bodycam footage shows Grant complaining of the heat on a few occasions. Although the exact temperature is missing from the record before the Court, multiple officers can be heard on the recordings complaining of the heat.

Defendants and Grant dispute whether the air conditioning was on in the patrol car. Grant testified at his deposition,

> At the time he placed me in the vehicle, there was no air conditioning. There was barely breathable oxygen. I started sweating profusely and was actually banging my head on the window, tell[ing] him I can't breathe. Can somebody please come open the door and give me some air, let me out of the car. And they left me in the car like that until a point to where I almost lost consciousness.

Mot. Ex. 7 at 50:13-21. He also testified the "engine was off" the entire time he was in the patrol vehicle. *Id.* at 51:22-53:5.

On Rodriguez's bodycam, he clearly tells Grant the air conditioning is running in the car, and he appears to manipulate the controls. Rodriguez Video #1 at 27:05. Grant can be heard saying he is sweating in the backseat. *Id.* He then asks Rodriguez to crack the window. *Id.* at 27:45. Rodriguez responded, "if I crack the window, you're not going to get any air because it is [so hot] outside," but he rolled the window down anyway. *Id.* at 27:50.

While in the back seat of the car, Grant frequently spoke with neighbors through the rolled-down window. When Grant asked a neighbor to bring him a bottle of water, Rodriguez helped Grant drink from it because he was in handcuffs. *Id.* at 39:00. Grant was visibly sweating through his shirt. *Id.* at 40:00.

When Rodriguez and Hawkes realized it would take some time to obtain a warrant, Hawkes asked Grant to sign a consent form to perform a complete search of the home and convertible. Mot. Ex. 4 at 0:30 (Hawkes Video #1). Grant would consent only to a search of his bedroom,

where he kept his rifle. *Id.* at 1:05. When Grant refused to consent to a search of the entire home, Hawkes tore up the form and walked away. *Id.* at 3:00.

Another officer then explained to Grant they wanted to search for a handgun they believed might be in the house. Rodriguez Video #1 at 1:06:40. Grant said, "I guess I didn't understand what you was saying, . . . . Tell him to bring the paper, I'll sign the paper. I'll let y'all go in there." *Id.* at 1:06:50. Other officers then placed Grant in the back of a prisoner transport van. *Id.* at 1:07:30. For the next approximately twenty minutes, Grant sat on the back bumper of the van, holding a bottle of water.

While waiting, Grant waved Hawkes over and said, "I'm [going] to just let y'all just go on in and -- you know what I mean? . . . Now I'm telling you to get the paper and I'll let y'all go on in." Hawkes Video #1 at 20:40. Grant explained his apparent change of mind saying, "I didn't have a clear understanding until --," so Hawkes's began looking for a second form. *Id.* at 20:50. At some point, officers called emergency medical services for Grant. When the ambulance arrived, Grant moved to its back bumper, and Hawkes suggested he sit in the shade to avoid the heat. *Id.* at 22:30.

When Hawkes and Rodriguez filled out the second form, they both verbally described it as for "the entire residence," although the form is illegible in the recording. *Id.* at 24:10. Hawkes then took the form to Grant and asked, "Who did you want to go in there and search?" Hawkes Video #1 at 25:20. Grant identified Hawkes and another officer, and when Hawkes asked if he would permit Rodriquez to search instead, Grant expressly assented. *Id.*

Grant then evidently experienced some distress from the heat, and Hawkes asked him, "You want to sign this before you get sick?" *Id.* at 28:00. Grant then appears to review and sign the form, although it is out of view of the camera. *Id.* at 28:15. Later, Grant testified he did sign the

form but is “not quite sure” what it meant. Mot. Ex. 7 at 56:21, 57:21-22. Hawkes then walked to Rodriguez, reported Grant signed the form, and placed it on the car windshield. Hawkes Video #1 at 28:20. For an unknown reason, the form is now missing. Rodriguez testified at his deposition he has “no idea” why his camera was inactive at the time. Mot. Ex. 9 at 79:7.

Rodriguez and another officer then searched the home and car. They found the rifle Grant had described as well as illegal drugs. Ultimately, Grant was charged with being a felon in possession of a firearm and possession of narcotics, but the charges were later dismissed.

Grant then brought this lawsuit against Rodriguez, Sholts, and unnamed John Doe deputies.

## III. STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

## IV. DISCUSSION AND ANALYSIS

As an initial point, Grant expressly states he “does not object to . . . Sholts’s motion” in his response to the motion. Response to Mot. at 7 n.1. He also fails to object to the Magistrate Judge’s recommendation the Court dismiss the John Doe deputies. Accordingly, because the Court agrees with the analysis in the Report, the Court will grant the motion as to Sholts and dismiss the John Doe deputies without prejudice.

In the complaint Grant grouped his allegations into a single cause of action under § 1983. The parties and Magistrate Judge considered his claims as follows: (1) for detaining and arresting him in violation of the Fourth Amendment, (2) for searching his home and car in violation of the Fourth Amendment, and (3) for deliberate indifference to his medical needs under the Due Process Clause of the Fourteenth Amendment. Grant also alleges Defendants allowed certain evidence favorable to him to be lost.

***A. Whether the subsequent search exceeded the scope of Grant's consent***

The Magistrate Judge recommends granting Defendants' motion as to Grant's claim the search of his home was unlawful. Grant objects the Magistrate Judge "never addresse[d] what [his] consent authorized." Obj. at 4. He argues the Magistrate Judge failed to consider whether officers exceeded the scope of his consent by searching the entire house.

Having reviewed the recordings, the Court is firmly convinced the only reasonable conclusion is Grant ultimately decided to permit a general search of the residence. The officers involved expressed dissatisfaction with Grant's initial limited consent, he later expressed he misunderstood them more than once, and then he repeatedly and in various terms stated he wanted officers to bring him another consent form so he could permit them to go inside. He then reviewed and signed the second form.

Further, Rodriguez and Grant both expressly—as is clear on the recordings—stated the second form was to consent to a search of the entire home. In contrast, Grant testified at his deposition he is "not quite sure what he signed." Mot. Ex. 7 at 57:21-22. Accordingly, both Grant's testimony and the recordings fail to indicate the signed consent form was of a limited scope in any way. Therefore, a reasonable jury would be required to conclude the officers searched the home pursuant to Grant's later, general consent to search.

Grant insists "[t]he only document that could establish [his consent] is the signed consent form or missing body-camera footage—both of which Defendants cannot produce." Obj. at 5. Again, having reviewed the footage, the Court is unable to agree with this assertion. This objection will be overruled. To the extent he raises a spoliation issue, the argument is addressed below, as is his argument his consent was involuntary.

***B. Whether the Magistrate Judge improperly made inferences in Defendants' favor***

Second, Grant objects the Magistrate Judge made several inferences "in favor of the moving party" which is inappropriate on a motion for summary judgment. Obj. at 6-7. Grant identified six specific sentences in the Report which, to him, demonstrate these impermissible inferences. Obj. at 7.

Grant is correct on the legal principle: "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Here, however, four of the six challenged statements in the Report are clearly conclusions a reasonable jury would be required to reach certain conclusions. *See* Report at 12 ("The evidence compels the conclusion . . . ."); Report at 14 ("[A] reasonable jury would be compelled to find . . . ."); Report at 14 ("[T]he uncontroverted evidence demands the inference . . . ."); Report at 19 ("The video evidence compels the conclusion . . . ."). Conclusions like these are appropriate on review of a motion for summary judgment because "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249 (citation omitted).

Those challenged conclusions in the Report are merely—and correctly—conclusions Grant failed to establish a "genuine" issue for trial, and as such summary judgment is proper on those issues. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The objection will also be overruled on these points.

Grant's other two challenged statements, as written, might appear at first glance to be inferences which could have—and should have—been resolved in his favor. First, Grant challenges the following statement in the Report: "The evidence before the court supports a reasonable inference . . . [Grant] was called away from his house for questioning because the officers were concerned . . . [he] may have already hidden or was planning to hide a gun in the house." Report at 12.

In making this statement, the Magistrate Judge cited portions of the bodycam videos before the Court. In the cited portions, Hawkes described arriving on scene, stated he saw Grant standing at the open door to his house with "something in his hand," and reasoned Grant "could have tossed the gun" inside, so they ought to search the house. Rodriguez Video #1 at 45:40; Hawkes Video #2 at 47:20. Given these recordings and the circumstances of the call, the Court believes a reasonable jury would be compelled to reach the same conclusion as the Magistrate Judge. Therefore, this objection will be overruled, too.

Second, Grant challenges this statement: "the body-worn camera footage supports the inference [Grant] willingly and voluntarily consented to the search." Report at 18. It is clear from reviewing this statement in context, the Magistrate Judge meant a reasonable jury would be required to find he voluntarily consented. The fact she used other language is immaterial. In any

event, the Court believes a jury would be required to so find, as addressed below. Therefore, this objection will be overruled.

### *C. Whether there should be an adverse inference in Grant's favor due to alleged spoliation of evidence*

Grant argues the Court must apply an adverse inference to defendants because they destroyed or lost the second consent form and they are missing portions of "body camera footage from the critical period when consent was allegedly obtained at the ambulance." Response to Mot. at 22-23. The Magistrate Judge rejected his argument because "there is no evidence that [D]efendants deliberately or intentionally destroyed or lost" the evidence Grant seeks. Report at 18.

Grant objects to this conclusion and asserts this spoliation issue, at least as to bodycam footage, is governed by Rule 37(e) of the Federal Rules of Evidence but "[t]he R&R does not mention Rule 37(e) anywhere." Obj. at 9. More specifically, he insists he demonstrated prejudice under Rule 37(e)(1), even if he failed to demonstrate the intent required for sanctions under Rule 37(e)(2).

Rule 37(e) deals with lost electronically stored information, and it provides the court:

> (1) upon finding prejudice to another party from the loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use the litigation:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the part; or
> >
> > (c) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Based on these provisions, Grant asserts the Magistrate Judge erred because she "found no intent and stopped" without considering whether he was prejudiced. Obj. at 10.

***1. Whether Grant was prejudiced by the missing bodycam footage***

First, Grant complains "Rodriguez's body-worn camera was not recording" during the period when he signed the consent form while sitting outside the ambulance. Obj. at 10. Grant testified at his deposition,

> At the time I was sitting on the back of the ambulance, the ambulance driver informed the officers that my blood pressure had spiked to the point that I was on the verge of stroking out. At that particular time, the officer grabbed the door of the ambulance and said; We're not letting him go anywhere til he give[s] us consent to search the house.

Mot. Ex. 7 at 56:12-19. It is this testimony he relies upon to show his consent to search was involuntary, and it is this exchange he alleges Rodriguez failed to capture on his bodycam.

The portions of Rodriquez's bodycam footage before the Court do fail to include the time while Grant sat on the ambulance. As noted above, Rodriguez testified he has "no idea" why his camera was inactive at the time. Mot. Ex. 9 at 79:7. Critically, however, Hawkes's bodycam video shows the entire relevant period while Grant was sitting outside the ambulance.

Hawkes's bodycam shows Grant sitting in the back of the prisoner transport van before the ambulance arrived when he called Hawkes's over and, as described above, stated he will give them consent to search if he would bring over another form. Hawkes Video #1 at 20:30. The ambulance is then seen on the recording as it arrives. *Id.* at 21:35. Hawkes retrieves the form and walks back over to Grant who is then sitting at the back of the ambulance with an ice pack on his neck. *Id.* at 22:25. At the time, as seen on the video, the ambulance doors are closed. *Id.* at 22:32.

Hawkes then walks away from Grant who is off-screen for approximately a minute before the ambulance comes back into view, this time with the door open. *Id.* at 23:42. Hawkes and

Rodriguez then spend another minute filling the form out while an EMS technician assists Grant. *Id.* at 23:45-25:15. Hawkes returns to Grant, who is visibly in some distress, and offers him the consent form to sign. *Id.* at 25:55. Grant begins reading the document before indicating he might vomit, so Hawkes takes the form back. *Id.* at 26:00-27:30.

An EMS technician then tells Hawkes Grant "needs to go" because of his blood pressure. *Id.* at 27:15. After a moment, Hawkes asks Grant, "You want to sign this before you get sick?" *Id.* at 28:10. In the brief period before Grant then signs the consent form, the nearby officers' statements to him are unambiguously recorded. *Id.* at 28:00-28:45. They are all objectively non-threatening attempts to help him feel better. *Id.* Grant reviews the form, signs it, and returns it to Hawkes, who walks away. *Id.* at 28:30. The threat Grant described at his deposition never occurs.

Because Hawkes's bodycam recorded the entire exchange when Grant signed the form, he is unable to demonstrate any prejudice from Rodriguez's failure to record the interaction.

***2. Whether Grant was prejudiced by the missing consent form***

Grant also argues Defendants failed to preserve the signed consent form and objects to the Magistrate Judge's recommendation against any adverse inference for the loss. As earlier noted, Rodriguez testified he is unaware of what happened to the consent form Grant signed. Mot. Ex. 9 at 77:11-14.

Because this the consent form was a physical document, Rule 37(e) is inapplicable by its terms, and this issue is instead controlled by the traditional spoliation rules. As such, the Magistrate Judge correctly considered whether Defendants' "intentional conduct contribute[d] to the loss or destruction of evidence[.]" *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

Grant has failed to show the form is missing due to intentional conduct. The only evidence before the Court indicates it is unknown why the form is missing. Imposing an adverse inference "merely from [the] negligent loss or destruction of evidence," *id.*, would be improper, and the Court declines to do so.

Moreover, Grant has failed to demonstrate any prejudice from the loss. As has been explained, Hawkes's recording makes clear Grant expressly stated he would consent to a search of the house, the officers filled in the form to permit a complete search of the house, Grant read the form, and then he signed it.

Although the recording could be marginally clearer in some parts, the Court is firmly convinced this is what occurred and a reasonable jury would be compelled to agree. Grant relies on pure speculation to suggest the form authorized anything less than a complete search of the house and car. Therefore, it is immaterial the signed form is missing, and this objection will also be overruled.

***D. Whether the initial search of the vehicle was valid***

Next, Grant alleges officers violated his right under the Fourth Amendment to be free of unreasonable searches when officers initially searched his car without a warrant.

The Magistrate Judge suggests the initial search of Grant's car was valid on the basis of *Michigan v. Long*, 463 U.S. 1032 (1983), and *United States v. Holmes*, 376 F.3d 270 (4th Cir. 2004), which allow a vehicle search based on reasonable suspicion alone if the suspect might be dangerous and there could be an accessible weapon. Report at 14-16. The Magistrate Judge concluded "no reasonable jury could find that the officers were not justified in searching [Grant's] car for a weapon, including searching in the center console." Report at 15.

***1. Whether the officers validly entered the curtilage of Grant's home***

Grant objects the Magistrate Judge failed to consider whether his "driveway was curtilage" and whether the warrantless search was therefore improper. Obj. at 11-12.

As an initial matter, Grant asserts his convertible was parked in a short driveway within the curtilage of his home. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("We . . . regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984))). Defendants fail to suggest otherwise. Therefore, the Court will assume the driveway and car were within the curtilage of his home for purposes of this motion.

In Grant's objections to the Report, he maintains the Court must consider two separate questions: "The first is whether an exception justifies searching the vehicle. The second is whether the officer had a lawful right of access to the [driveway]." Obj. at 12. To Grant, the Magistrate Judge's analysis under *Long* and *Holmes* "goes to the first inquiry" alone without considering whether the officers had "a right to stand in the curtilage of the home" in the first place. Obj. at 12.

Relying on *Collins v. Virginia*, 584 U.S. 586 (2018), Grant insists the officers lacked lawful authority to enter the curtilage or conduct the initial search within the car. In *Collins*, the Supreme Court held invalid an officer's search of a motorcycle in the driveway inside the curtilage of the defendant's home. 584 U.S. at 601. It refused to allow the automobile exception to the warrant requirement to support the search because by "physically intruding on the curtilage of Collins' home to search the motorcycle" the officer "invaded Collins' Fourth Amendment interest in the curtilage of his home." 584 U.S. at 594. The Court explained an officer must possess "a lawful right of access to a vehicle" before authority to search the automobile resolves the constitutional question. 584 U.S. at 598.

Here, the Magistrate Judge distinguished *Collins* because "it did not involve a *Terry* stop, a potentially armed subject, the report of a violent crime, or suspicion that the vehicle at issue contained a weapon of which the suspect could potentially gain control." Report at 15. Grant disagrees and insists even if the officers "could lawfully walk up" his driveway, it "does not mean they could search a vehicle parked there." Obj. at 13.

With respect for the Magistrate Judge's plausible analysis of this complicated legal issue, the Court agrees with Grant for two reasons. First, Defendants have failed to ever even attempt to justify their entrance into the curtilage. As the moving party, it was their obligation to demonstrate summary judgment is proper. Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows . . . the movant is entitled to judgment as a matter of law."). They have failed to do so, and this Court declines to justify the search for them. *See* Fed. R. Civ. P. 56(f) (providing the Court may "grant the motion [for summary judgment] on grounds not raised by a party" only after "giving notice and a reasonable time to respond").

In the motion for summary judgment, Defendants expressly declined to address the search of Grant's car. Mot. at 14 ("[T]hese Defendants will concentrate on the lawfulness of Rodriguez's [later] search of the house."). Grant then raised the issue in his response and expressly relied on *Collins*. *See* Response to Mot. at 18 ("The warrantless search of [the] vehicle within the curtilage of his home violated established Fourth Amendment law . . . ."). Despite this clarity, Defendants only cursorily responded in their reply: "Hawkes recognized that an easily accessible weapon . . . could be located inside the vehicle, since a handgun would be easily concealable in the car's interior." Reply to Mot. at 9.

Defendants also failed to even reference *Long*—permitting *Terry*-style investigative searches of vehicles in certain circumstances, 463 U.S. 1032—and instead relied upon *Arizona v.*

*Gant*, 556 U.S. 332 (2009). But *Gant* is irrelevant as it permits officers to "search a vehicle incident to a recent occupant's arrest[.]" 556 U.S. at 351. Here, Rodriguez specifically told Grant he was "not under arrest," Rodriguez Video #1 at 2:00, and he testified at his deposition Grant was under arrest only "when we were able to confirm that he was wanted out of another jurisdiction for outstanding warrants[,]" Mot. Ex. 9 at 41:2-7. Yet Hawkes had already searched the car.

When Grant again raised the curtilage argument in his objections to the Report, Defendants again failed to respond in any way. Grant very clearly raised eight distinct objections, and Defendants responded to merely the first two. Again, they have failed to ever articulate to this Court any legal basis for the search of the car within the curtilage of the home, particularly one based on only reasonable suspicion. It is beyond the Court's role to raise defenses and arguments on behalf of officers' allegedly unconstitutional conduct.

The second reason the Court agrees with Grant is a warrantless search of the curtilage is typically invalid. *Collins*, 584 U.S. at 595 ("Nothing in our case law . . . suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle without a warrant."). "As with homes themselves, 'probable cause, and not reasonable suspicion, is the appropriate standard for searches of the curtilage.'" *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192 (4th Cir. 2015) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir.2001)). Thus, here, the Court must "presume [the] warrantless search of curtilage to be unreasonable." *Id.* (quoting *Carman v. Carroll*, 749 F.3d 192, 197 (3d Cir.), *rev'd on other grounds*, 574 U.S. 13 (2014)).

The only exception to the warrant requirement which might support this conduct is the exigent circumstances exception. The "Supreme Court has held that 'the exigencies of the situation' may render 'the needs of law enforcement so compelling that [a] warrantless search is

objectively reasonable under the Fourth Amendment." *United States v. Curry*, 965 F.3d 313, 321 (4th Cir. 2020) (alteration in original) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)), *as amended* (July 15, 2020), *as amended* (July 16, 2020).

The exception depends on "totality of the circumstances," and the Supreme Court has delineated only three categories "emergency conditions" which justify the exception: "(1) the need to 'pursue a fleeing suspect'; (2) the need to 'protect individuals who are threatened with imminent harm'; and (3) the need to 'prevent the imminent destruction of evidence.'" *Id.* (citations omitted).

Importantly, and as noted, the government has failed to argue this exception justifies the search. This strongly suggests they thought exigent circumstances were absent during their initial search of Grant's car. Surely, if they thought exigent circumstances were present, they would have argued so.

Additionally, although the Court is disinclined to make arguments for the parties, even if it were so inclined, these circumstances fail to justify the exception. For the first and third categories, Grant was not fleeing, and there was no risk evidence would be destroyed in any way. Only the second category could even plausibly be applicable, and perhaps that was the intent of Defendants' unsubstantiated point "a handgun would be easily concealable in the car's interior." Reply to Mot. at 9.

But the argument fails because there was no evidence of any ongoing threat or danger. Grant voluntarily approached the officers when they called out to him. They then immediately put him in handcuffs and patted him down. Ten minutes later—after Grant stood there peacefully the entire time—Hawkes opened the locked center console of the car. Most importantly, if their concern was with Grant's dangerousness or the risk he might obtain the firearm from the car, they

could have easily taken his keys from his person or walked him away from the vehicle. Instead, they opened a locked container within the curtilage of his home.

In these circumstances and on the arguments before the Court, Defendants have failed to support their motion and a jury could find this search was unreasonable.

### *2. Whether Defendants' alternative bases support the motion*

Because the Magistrate Judge concluded Grant failed to establish a constitutional violation, it was unnecessary for her to consider Defendants' two other asserted bases for summary judgment.

First, Defendants contend they are entitled to qualified immunity because they had, at least, "arguable reasonable suspicion" for the stop and the search. Mot. at 23-24. They cite several cases holding arguable reasonable suspicion—short of actual reasonable suspicion—is sufficient to afford officers immunity for an unconstitutional search. *See, e.g.*, *De La Rosa v. White*, 852 F.3d 740, 745-46 (8th Cir. 2017) ("Trooper White is entitled to qualified immunity if a reasonable officer could have believed that he had a reasonable suspicion; in other words, if he had arguable reasonable suspicion.").

This argument is unavailing even assuming Defendants had reasonable suspicion because probable cause and a warrant are presumptively necessary to search the curtilage. As this is the only argument Defendants make in support of immunity, the Court declines to grant the motion on this basis. *See Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (citing *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 226 (4th Cir. 1997) ("[A] claim of qualified immunity can be waived if not squarely presented to the district court.").

Second, Defendants argue Grant "is unable to establish a bystander liability theory against Rodriguez." Reply to Mot. at 12. The Fourth Circuit has recognized officers can be liable for another's conduct because of "a law officer's duty to uphold the law and protect the public from

illegal acts, regardless of who commits them." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002). There are three elements to the theory, *id.*, but it is unnecessary to address them here in any detail because, once again, Defendants fail to challenge the theory in any substantive way, other than to claim Grant has failed to demonstrate a constitutional violation.

Grant expressly and clearly asserted Rodriguez could be subject to bystander liability for Hawkes's search of the vehicle in his response in opposition to the motion for summary judgment. Pl. Response in Opp. at 29. Nonetheless, Defendants failed to respond to this argument at all except to assert Grant "failed to show that his constitutional rights were violated, and therefore neither Hawkes nor Rodriguez acted unlawfully in their interactions with him." Reply to Mot. at 13. In their reply to the objections to the Report, they failed to address the theory in any way whatsoever.

Because the Court holds Defendants have failed to support their motion concerning the legitimacy of the search, Defendants have failed to demonstrate they are "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), on bystander liability. Therefore, the motion will be denied with respect to the initial search of Grant's car.

***E. Whether Grant's consent to search was voluntarily given***

Grant objects to the Magistrate Judge's conclusion "[n]o reasonable jury could find . . . the conditions under which [he] provided his consent rendered it involuntary or invalid." Report at 19-20. He raises several arguments.

First, Grant relies on his initial refusal to sign the consent form. As explained above, after reviewing the recordings, the Court is firmly convinced he changed his mind and voluntarily permitted a search of the entire home. *See Witt v. W. Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) ("[W]hen a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of

the facts for purposes of ruling on a motion for summary judgment.'" (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)) (second alteration and omission in original)).

Second, and similarly, Grant asserts he consented only to a limited search of the master bedroom before EMS arrived. Again, for the reasons already given, this argument will be rejected.

Third, Grant asserts his medical condition at the time of his subsequent consent renders it involuntary and invalid. As already explained, Grant's testimony officers refused to permit him to go to the hospital before he consented to a search must be rejected. Excluding this testimony, the recording conclusively demonstrates his consent and the surrounding circumstances such that a reasonable jury would be compelled to find his consent was voluntarily given.

Fourth, and finally, Grant insists his consent is invalid because Rodriguez told him he had only two choices: he could either consent to a search of the home or they would obtain a warrant and search it anyway. Grant attempts to liken his case to *Bumper v. North Carolina*, 391 U.S. 543 (1968). Obj. at 18. In *Bumper*, the state proceeded at trial to support its search of the defendant's residence solely on the basis of consent. 91 U.S. at 546 & n.7. The consent was obtained, however, only after officers forced their way into the home and announced they had a warrant. 91 U.S. at 546-47. The Court rejected this so-called consent: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." 91 U.S. at 549.

*Bumper* is easily distinguished because there is a material difference between an officer announcing he is already in possession of a warrant and one claiming he will be able to obtain one. In the first, "he announces in effect that the occupant has no right to resist the search." *Id.* Any potential consent obtained after such a point is illusory. In the second, the officer expressly gives

the suspect the opportunity to assert his right to require a warrant be obtained rather than consent to the search. The difference matters.

Here, Grant was told he could consent, and if he failed to do so Rodriquez would get a warrant. Such an explanation of the procedure likely to follow fails to render Grant's consent invalid. Grant was informed he could refuse to consent to the search, and he did so for over half an hour. He then changed his mind.

Taking all reasonable inferences in Grant's favor, and having thoroughly reviewed the relevant parts of the record, the Court concludes a reasonable jury would be compelled to determine Grant's consent was given voluntarily. Therefore, the Court will also overrule this objection.

### *F. Whether there is a genuine issue of material fact on Grant's deliberate indifference claim*

Grant objects to the Magistrate Judge's suggestion his claim for deliberate indifference to his medical needs under the Due Process Clause should be dismissed. He claims the Magistrate Judge incorrectly applied a "subjective standard" and incorrectly determined a jury would be compelled to reject the claim as a matter of law. Obj. at 15-16.

The relevant facts have already been recited above and are accurately stated in the Report. In sum, Grant stated it was hot on several occasions and was visibly sweating. But officers rolled the window down on his request, helped him drink water, advised him to move to the shade, and called emergency medical services.

After extensive review of the bodycam videos, it is impossible to describe the officers' conduct as deliberately indifferent to Grant's condition, even if the air conditioning was turned off. Rather, they repeatedly and promptly responded to his complaints. More importantly, a reasonable jury would be unable to conclude their actions or inaction created an "unjustifiably high risk of

harm" to Grant. *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). The Report correctly resolved this issue.

Additionally, Grant's objection about the Magistrate Judge's alleged "subjective inquiry" is simply mistaken. His arguments about what Rodriguez or a reasonable officer should have known is immaterial; what matters is officers observed he was potentially overheating and took indisputably reasonable steps to address it. This objection will be overruled, too.

### *G. Whether the Magistrate Judge incorrectly concluded bystander liability is inapplicable*

Grant's seventh objection is to the Magistrate judge's disposition of his bystander liability theory. In a footnote, the Magistrate Judge rejected his argument purely "[b]ecause the evidence does not support the inference that [Grant]'s Fourth Amendment rights were violated . . . ." Report at 16 n.23.

For the reasons explained above, this objection will be sustained to the extent the Court declines to grant the motion as to the initial search.

### *H. Whether Grant's remaining objections are meritorious*

Grant's final objection is a collection of brief statements re-asserting several of his arguments raised in his response to the motion for summary judgment.

First, he objects to the Magistrate Judge's conclusion "Rodriquez possessed reasonable suspicion to detain [him] initially[.]" Obj. at 20. This objection will be overruled for the reasons stated in the Report. Namely, Witt's immediate report and willingness to personally identify Grant as the offender discloses sufficient indicia of reliability to support a reasonable suspicion Grant might have committed a crime and was dangerous.

Second, he objects to the Magistrate Judge's conclusion "the detention did not exceed the permissible scope and duration of an investigatory stop under *Terry v. Ohio*[.]" Obj. at 20. This

argument must also be rejected. Prior to being put in Rodriguez's car where he was then arrested, Grant was detained for less than fifteen minutes while he spoke with Rodriguez as Hawkes investigated the scene. Once they discovered Grant in fact had a firearm in his car despite his repeated insistence to the contrary, he was taken to the cruiser and arrested. This detention was irrefutably reasonable under the circumstances. The Report correctly resolved this issue, and the objection will be overruled.

Third, Grant argues the Magistrate judge erred in concluding "the initial protective sweep of [his] home was lawful." Obj. at 20. In precisely the same way Defendants failed to justify Hawkes's initial search of Grant's car, they also failed to attempt to justify the initial search of his home. And it was without a doubt a search. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) ("When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012))).

In his response to the motion for summary judgment, Grant correctly noted, "Defendants' Motion conspicuously ignore this [allegation] entirely." Pl. Response in Opp. 17. Defendants' replies to Grant's response to the motion and objections to the Report insufficiently addressed the issue as explained above. Therefore, for these reasons, the Court will deny Defendants' motion as to the initial search of the car and the home.

Finally, Grant "objects to any resolution of qualified immunity in Defendants' favor on this record . . . ." Obj. at 20. This objection is moot because the Court has already declined to resolve qualified immunity in Defendants' favor where it may have applied.

## V. CONCLUSION

For the reasons explained above, and after a thorough review of the record in this case pursuant to the standard set forth above, the Court overrules Grant's objections in part, sustains them in part, adopts the Report to the extent it is consistent with this order, and incorporates those portions herein.

The motion for summary judgment is **GRANTED** as to Sholts on all claims. It is also **GRANTED** as to Rodriguez on Grant's claim for the alleged violations of the Fourteenth Amendment, Grant's initial detention and ultimate arrest, and the later search conducted with his consent. The motion is **DENIED** as to Rodriguez on Grant's claim of a Fourth Amendment violation for the initial searches of his home and car prior to his arrest. Finally, Defendant John Doe Deputies are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

Signed this 30th day of September, 2026, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE